### S. H. KRESS & CO. v. LAWRENCE.

(Court of Civil Appeals of Texas. Texarkana. Dec. 11, 1913. Rehearing Denied Jan. 8, 1914.)

1. FALSE IMPRISONMENT (§ 31*)—EVIDENCE—WEIGHT AND SUFFICIENCY.

In an action for false imprisonment against the proprietor of a store, evidence *held* to support a jury finding that its employés wrongfully assaulted and detained plaintiff as claimed by him.

[Ed. Note.—For other cases, see False Imprisonment, Cent. Dig. § 108; Dec. Dig. § 31.*]

2. FALSE IMPRISONMENT (§ 13*)—DEFENSES—PROBABLE CAUSE.

Under Willson's Cr. St. 1895 (Code Cr. Proc. 1895) art. 247, providing that a peace officer or other person may, without a warrant, arrest an offender when the offense is committed in his presence or within his view, if the offense is a felony or an offense against the public peace, and Willson's Cr. St. 1895 (Pen. Code 1895) art. 593, providing that violence does not amount to an assault when committed

in preventing an intrusion upon the lawful possession of the property, and article 622 providing, relative to false imprisonment, that it is not an offense to detain a person in the cases mentioned in article 593, as justifying the use of force, but that it must be shown that the detention was necessary to effect such object, in an action against the proprietor of a store for arresting and detaining plaintiff, it was not a defense that plaintiff's conduct was such as to lead a person of ordinary care, observing his conduct, and did lead defendant's employés, in good faith to believe that he had stolen a pin worth ten cents, on the theory of estoppel, since if he had taken the pin defendant's employés would have had no lawful right to arrest and detain him, as the theft thereof would not be a felony or offense against the public peace, and defendant, no longer having possession of the pin, could not justify the detention as necessary to interrupt an intrusion upon such possession.

[Ed. Note.—For other cases, see False Imprisonment, Cent. Dig. §§ 6, 7, 31, 59; Dec. Dig. § 13.*]

3. FALSE IMPRISONMENT (§ 8*) — DEFENSES — PROBABLE CAUSE.

Assuming that the fact that plaintiff's conduct was such as to lead defendant's employés in good faith to believe he had stolen a pin justified his arrest and detention by such employés on the theory of estoppel, it did not justify them in forcibly compelling him to go to defendant's office and there submit to a search, where, upon being arrested, he promptly denied the theft and offered to show by turning his pockets inside out that he had not taken the pin, and hence an instruction to find for defendants, if such employés did what the proof showed they did to plaintiff in consequence of the belief so induced, was properly refused.

[Ed. Note.—For other cases, see False Imprisonment, Cent. Dig. §§ 68–73; Dec. Dig. § 8.*]

4. TRIAL (§ 252*)—INSTRUCTIONS—CONFORMITY TO EVIDENCE.

In an action for false imprisonment against the proprietor of a store, an instruction that, if defendant's manager saw plaintiff take a stick pin or other article of jewelry and put it in his pocket, then put it back on the counter, again take it up, put it in his pocket, and walk off with it, he had a right to detain plaintiff to recover the pin or to determine what he did with it was properly refused, even if otherwise proper, where the evidence showed conclusively that plaintiff did not in fact walk off with the pin.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 505, 596–612; Dec. Dig. § 252.*]

5. FALSE IMPRISONMENT (§ 40*) — INSTRUCTIONS—CONFORMITY TO PLEADINGS AND EVIDENCE.

In an action for false imprisonment, where the petition alleged that defendant's manager and another employé in defendant's store unlawfully arrested him, forced him to go to its office, where they unlawfully searched his person, and he testified that as he was leaving the store the manager and another employé stopped him, demanding to know where he was going with a pin, that he denied that he had the pin, that the manager, with a hand on plaintiff's shoulder, said, "Let's go back and see," that they then went to another floor of the building where he was told to turn his pockets inside out, which he did, that the manager and the other employé walked behind him, and that the other employé held him by the collar and pushed him along, an instruction submitting the question whether defendant's employés took hold of and examined plaintiff against his will

and without his consent was justified by the pleadings and evidence.

[Ed. Note.—For other cases, see False Imprisonment, Cent. Dig. § 119; Dec. Dig. § 40.*]

6. FALSE IMPRISONMENT (§ 36*)—EXCESSIVENESS—PERSONAL INJURIES.

In an action for false imprisonment, plaintiff, a boy 12 years old, testified that as he was leaving defendant's store two of defendant's employés stopped him, demanding to know where he was going with a pin; that they then pushed him through the store and through a crowd of negroes to the back of the store and up a stairway to the office, where they compelled him to turn his pockets inside out. He admitted having picked up the pin and looked at it, and defendant's manager claimed that he saw him put the pin in his pocket, and that plaintiff made no objection to going to the office, and that he turned his pockets out voluntarily. Held that, under the circumstances of the case, a verdict for $1,000 was excessive and required a reversal, unless plaintiff filed a remittitur of $500.

[Ed. Note.—For other cases, see False Imprisonment, Cent. Dig. §§ 110, 113–115; Dec. Dig. § 36.*]

Appeal from District Court, Bowie County; H. F. O'Neal, Judge.

Action by Clinton Lawrence, by next friend, against S. H. Kress & Co. Judgment for plaintiff, and defendant appeals. Reversed conditionally.

Glass, Estes, King & Burford, of Texarkana, for appellant. Mahaffey & Thomas and P. A. Turner, all of Texarkana, for appellee.

WILLSON, C. J. This was a suit for damages for false imprisonment, brought by appellee against appellant, in which judgment was rendered in favor of the former against the latter for the sum of $1,000.

[1] Appellant, a corporation, owned and operated a store in the city of Texarkana, where it kept for sale, displayed on open counters, accessible to persons who might wish to examine them, jewelry, toys, music, glassware, and innumerable other articles, ranging in price from 5 to 25 cents. Between 8 and 9 o'clock in the evening of Saturday, October 26, 1912, appellee, a boy 12 years of age, and his sister, a young lady 16 years of age, went to appellant's said store, where appellee's sister bought some glass tumblers, which she gave to appellee to carry. She then proceeded to look at sheet music displayed in the rear end of the store, while appellee went towards the front part of the store, stopping at a counter where a lot of cheap jewelry was displayed. Having completed her inspection of the music, appellee's sister came to where he was and, touching him on the shoulder, told him to "come on, let's go," walking on towards the front door. Appellee followed after her and had reached a point near the door when appellant's manager, Scott, and another of its employés, named James, described as a "floor man," stopped him. Appellee's account (testifying

as a witness) of what then occurred was as follows: "They (meaning Scott and James) caught me by the collar and back of the neck and said, 'Where are you going with that pin in your pocket?' I replied, 'I haven't got any pin in my pocket.' I had bought some candy in the store, a nickel's worth. I had that candy in my pocket, right-hand pocket of my coat. The man then said, 'Let's go back here and see.' He had me right by the back of my neck and pushed me through the store and through a big crowd of negroes at the back of the store, and he took me up some stair-steps and told me to turn all my pockets wrongside out, and I didn't say anything. I had some candy in my pocket and I took it out and turned my pockets, and one of them said, 'Any candy on the shelf that he could have stolen?' and I said, 'I never stole any candy;' and he said: 'I thought you had a pin in your pocket. You had better be careful how you handle things in this store. We catch many boys stealing.' Then they told me I could go. That store runs from one block to the other, from the north side of Broad street clear back to the alley, something like 140 feet, and is 50 feet wide, two lots, and I was close, I guess five or six feet, to the west front door when the man caught me in the back of the neck by the collar. He pushed me all along from the front of the store to the back of the store, and pushed me right through a big crowd of negroes along up the stairways. Both of them followed me to the back end of the store. They didn't say anything to me when I was going from the front end of the store to the back end of the store. They didn't tell me what they were taking me for. After they took me up the stairway they told me to turn all of my pockets wrongside out. I had four pockets in my pants, two side pockets and hip pockets, and I turned all of them wrongside out. I also had a little watch pocket, and I turned that wrongside out. They told me to turn every one of my pockets. I also turned my coat pockets. My coat had one pocket on each side, one side pocket on the outside and one pocket on the inside. I had the candy in the right-hand pocket of my coat. When I turned that the candy came down on the floor, and then I took everything out of the pocket and turned it. I set the glasses down on the floor. I carried the glasses up the stairs with me. When one of them asked me if there was any candy out on the shelf that I could have stolen, I said: 'I didn't steal this candy, I bought it.' After they got through turning my pockets, they said: 'We see you haven't got the pin, but I thought I saw you put it in your pocket. You had better be careful how you handle things around here. We catch so many boys stealing.' And said, 'You can go now.' Then I put everything back in my pockets and picked up the glasses and went home." On his cross-examination ap-

pellee testified: "These pins were just laid on the counter, open counter, and I picked up one of these pins and looked at it, and' put it back. Q. Did you do that more than once? A. No, sir; I didn't pick it up but once, just picked it up and looked at it and put it back. No boys were around there that I knew. I asked the young lady waiting on this counter how much the pins were, and she said ten cents. She did not ask me if I wanted any. Q. Did she turn away? A. No, sir. The store was crowded and I asked this young lady how much the pins were, and she told me ten cents. That was before I picked up one of them. Then I looked at them and she was still standing there watching me, and I put it back. I didn't have any idea of taking one, and I was just looking at it. Q. Now is it possible that you looked at that twice, Clinton? A. No, sir; only once. Q. Perfectly sure of it? A. Yes, sir. Q. When the young lady told you the price of the pin you picked it up and put it back, and then your sister came up and said, 'Let's go'? A. Yes, sir. Q. Now your sister left out the west door, and you were following her with the glasses, and you say two men stopped you? A. Yes, sir. Q. And this was one of them (pointing to Mr. Scott)? A. Yes, sir. Just one of them got me by the collar. Q. Did Mr, Scott catch you by the collar? A. I think it was the other man. Q. Did Mr. Scott put his hands on you? A. Yes, sir; and when he told me to come on he took them off. Q. Did only one of them catch you by the collar? A. Yes, sir. Q. Where did the other one put his hands on you? A. Put his hand on my shoulder. Q. Which one asked you about the pin? A. Mr. Scott. And I told him that I didn't have any pin,. and he said, 'Let's go back and see.' Q. Now you didn't object to going back, did you? A. I knew I didn't have the pin. Q. You preferred to show him that you didn't have the pin, didn't you, and you didn't object to going back there, did you? A. I didn't want to go back there. I would rather have emptied my pockets right there and shown everybody that I didn't have it. I asked them to let me empty my pockets there. I went back with them when they said, 'Let's go back and see.' He caught hold to the collar of my waist and had his fingers on my neck. He didn't have his hands on my shoulder. The other one had his hand on my shoulder; and Mr. Scott was the one who did the talking. I am perfectly sure that they caught me by the collar, and I am perfectly sure that they pushed me down the aisle. Q. Isn't it a fact that when you were first stopped Mr. Scott was not there? A. Both of them were there. I am perfectly sure of that. Q. Now did he keep his hands on you until you started up the stairway? A. When we got to the stairway he turned me loose and told me to turn all of my pockets out. Q. Did both men keep their hands

on you when they were going down the aisle? A. No, sir. Mr. Scott didn't; the other man did, and pushed me through the middle of a crowd of negroes. Mr. Scott didn't have his hands on me when we walked down the aisle. The other man was behind me and just used one hand holding my collar. Q. Now, were you on the east or west of him? A. In front of him; he was right behind me. He had one hand holding me by the collar and the other hand was on my body, and when I got up the stairs he told me to empty my pockets, and I turned them all out. I had some candy in one pocket. After they got through Mr. Scott said, 'I thought you had a pin in your pocket.' It was Mr. Scott who said I had better be careful around there about the way I handle things. The other man asked Mr. Scott if there was any candy that I could have stolen. Except that Mr. Scott did all the talking."

The account of appellant's manager (Scott) of what occurred was as follows: "On this Saturday evening I saw Clinton Lawrence, the boy who testified yesterday. I had never seen him before, nor his parents. My office is in the rear of the floor, on the balcony floor, is reached by a stairway, and overlooks the entire store. I was there in my office talking to Mr. McDonald, advertising manager of the Texarkanian, on business, and, as I always do on Saturday evenings. I never stay off of the floor for a very long time. I came down to take a walk around the store, and I saw this boy standing at the jewelry counter. The jewelry on this counter is a separate display, laid open on the counter, and is made up of scarf pins, tie pins, some beauty pins, different lines costing about ten cents. We sold these pins for ten cents. That counter was in the front of the store kinder running lengthwise down the center of the store, or about 20 feet from the front door. We have two front doors there, separately by display windows, and we have a waiting room just inside. Now just immediately opposite this waiting room, a few feet from it, are the glass showcases, and then the counters. This particular counter was near the front of the store. I observed that this boy was handling these pins. My attention was called to it in the way in which he was handling them, in a suspicious manner, and I saw him take one pin and place it in his pocket, and then he took it out and put it back and looked there for a little while, and he took up the pin again and placed it in his pocket. About this time I was called to the candy counter, and then I called the floor man, Mr. James, and told him to watch that boy, that he had a pin in his pocket. I went to the candy counter, and, after seeing that they were taking the candy orders down properly, I walked back towards the counter where this boy had been, and he wasn't there, he had gone, and about that time I saw him and Mr. James starting down

the west aisle going towards the office in the rear of the store. Mr. James is our floor man. He is the man who watches the floor, looks after sales girls, sees that the people are waited on, and sometimes watches the counters to see that no goods are stolen or taken away. It is a frequent thing for goods to be taken from the counter. As a rule we find boys taking things from the counters. I called the floor man's attention to this boy, and left him, and when I saw them again the boy and this man were walking back down the aisle towards the office. Mr. James did not have hold of the boy. The boy was in front of Mr. James. I did not put my hands on the boy. Q. Were you present when they started back down the aisle? A. I was not present when he stopped the boy or started back with him, but I saw them going down the aisle, and I followed behind Mr. James. I was maybe ten feet behind. Before we reached halfway of the store I was right behind. Then we went to the office. No one assisted the boy up the stairs. He did not offer any objections or resist in the slightest. The cashier and Mr. McDonald, the advertising manager of the Texarkanian, were up there in the office. The boy turned out his pockets. No one told him to, not that I heard. He just turned out his pockets. I observed some candy on him. I did not find a pin on him. I told him that he should be careful about standing at our counters and not to act in a suspicious manner, because we had had so much trouble with boys taking things away. The boy went on then. Nothing was said about it to any one that evening. I didn't mention it, and no one spoke to me of it. He had not started away when he put the pin in his pocket the last time. He was still standing there at the counter. I didn't see him put the pin back. He walked right back down the aisle ahead of Mr. James unassisted. I did not hear any one accuse the boy of theft. I did not see any one put their hands on him. I did not see any unwillingness or protest on his part. He went up the stairs and just turned his pockets out."

The finding of the jury, involved in their verdict, that appellant by its employés Scott and James wrongfully assaulted and detained appellee, and that he thereby was injured, is supported by testimony in the record, and we so find the facts to be.

The first paragraph of the court's charge to the jury, attacked as erroneous, was as follows: "If you believe from the evidence that the plaintiff, Clinton Lawrence, was, on or about the 26th day of October, 1912, in the store of S. H. Kress & Co., a private corporation, incorporated under the laws of Texas, and located at Texarkana, Tex., and was about to leave said store, and that Clarence Scott suspicioned or believed that plaintiff, Clinton Lawrence, had stolen some of the merchandise in and belonging to said

store, and acting under such belief he (said Scott) either in person, or acting with another, took hold of and examined him against his will, and without his consent, to find out if his (said Scott's) belief was true, and if you further believe from the evidence that the plaintiff, Clinton Lawrence, had not stolen any goods or merchandise from said store, and if you further believe from the evidence that while so taking, holding, and examining the plaintiff, Clinton Lawrence, if you find he did it, and that the said Clarence Scott was acting within the general scope of his authority and employment, then you will find for the plaintiff; or if you believe from the evidence that plaintiff had not stolen anything from said store, and if you further believe from the evidence that some other person, who was an employé of said S. H. Kress & Co., took hold of and examined the plaintiff, if you find that he did it, and said other person, an employé of said S. H. Kress & Co., was acting within the general scope of his employment, then you will find for the plaintiff."

Among other special charges requested by appellant were those numbered 2, 3, 4, and 5, which were refused by the court. His action in refusing them is assigned as error. Said special charges are copied below in the order mentioned:

No. 2: "You are instructed that if from the testimony you believe that C. W. Scott, the manager of defendant's store, saw the plaintiff take from the jewelry counter a stick pin, or some other article of jewelry, and put it in his pocket, and then put it back on the counter, and then take it up again, and again put it in his pocket, and walk off with it, then he had the right to detain, or cause to be detained, the plaintiff, either for the purpose of recovering said pin or to determine what he did with it, and the defendant would not be liable for the damages, if any, occasioned thereby."

No. 3: "You are instructed that if from the testimony you believe that the floor man called to the plaintiff as he was leaving the store and asked him what he had done with the stick pin, or where the stick pin was, or substantially that, and further that at the time he so called and asked said question he in good faith believed that the plaintiff had taken a stick pin from the jewelry counter, and had reasonable cause for such belief, and that thereafter the plaintiff denied that he had such pin and voluntarily offered to prove that he did not have it, that he willingly went to the office and there without objection and voluntarily exposed his pockets, then your verdict in this case should be for the defendant, even though you may believe that the plaintiff did not in fact carry off a stick pin from the counter, and even though the floor man guided or directed or instructed him to go to the office."

No. 4: "You are instructed that if from the testimony you believe that the plaintiff by his conduct induced the employés of the defendant to believe that he had taken from the jewelry counter a stick pin, and that a person of ordinary care and prudence under similar circumstances would have so believed, and that the floor man, by reason of such belief, caused the plaintiff to stop at or near the door, then your verdict should be for the defendant, even though you may further believe that the said floor man caused the plaintiff to go with him to the office of the store and there expose his pockets and do such other things as the proof shows he did do."

No. 5: "You are instructed that if from the testimony you believe that the plaintiff, when he was at the jewelry counter, conducted himself in such a manner as would have led a person of ordinary care and prudence observing him to believe that he was taking off a stick pin or some other article of jewelry, and that the employés of the defendant who observed said conduct were led to believe and in good faith did believe that he was doing so, and that thereafter, in consequence of such belief, did what the proof shows they thereafter did to plaintiff, then the plaintiff cannot recover and your verdict should be for the defendant."

[2, 3] Appellant's first assignment, in which it complains of the refusal of the court to give to the jury its special charge numbered 5, and its second assignment, in which it complains of the refusal of the court to give its special charge numbered 2, are grouped in the brief. Waiving a question as to whether appellant is entitled to have the assignments considered or not, because they present different questions, and therefore should not have been so grouped, we have considered them and are of the opinion they should be overruled.

It will be noted that said charge numbered 5 required the jury, without any qualification whatever, to find for appellant if they believed appellant's employés in good faith believed appellee had stolen the pin, and further believed that a person of ordinary care and prudence, observing his conduct as they did, would have reached a like conclusion. The contention made that it was error to refuse the charge is predicated on the testimony of appellant's manager, Scott, that he saw appellee take one of the pins and place it in his pocket. It is argued that if appellee did that he did wrong; that Scott was thereby misled; and that to permit appellee to recover damages for Scott's conduct in unlawfully arresting and detaining him would be to permit him to "profit by his own wrongdoing." As tending to support the contention, appellant cites Hays v. Creary, 60 Tex. 445, and Formwalt v. Hylton, 66 Tex. 290, 1 S. W. 376. In the first mentioned of the two cases it appeared that Creary, a sheriff, held a capias issued by a court in Falls county commanding him to arrest one Scott Myans, charged with an aggravated assault.

Creary arrested Hays, believing he was Myans. As excusing his mistake, the officer testified that Hays told him "he had lived in Falls county and had been there about two months ago; had a fight there, but had settled it." The court reversed a judgment in favor of the sheriff, saying the testimony referred to might be considered in mitigation of damages recoverable by Hays, but did not present a defense to any recovery at all by him. In the course of the court's opinion they quoted from 3 Waits' Actions and Defenses, p. 316, as follows: "In case a wrong person is arrested through mistake, all persons causing the arrest are liable for the injury, unless the party complaining has brought the injury upon himself by his own misstatements and misrepresentations. Thus, if there was a legal ground for arresting A., and B. represents himself to be A. and is arrested in consequence of that representation, he has obviously no valid ground for complaining of the imprisonment which naturally resulted from his own act. But, after he has given notice that he is not the person he represented himself to be, he cannot lawfully be detained for a greater length of time than may be reasonably necessary to ascertain which of the several statements he has made is in accordance with the truth." In the other case mentioned it appeared that Formwalt, a sheriff, and others acting with him, having a warrant commanding them to arrest Dow and Riley Hylton, by mistake, it was claimed, arrested E. Hylton, the plaintiff, father of said Dow and Riley Hylton. The Supreme Court, affirming a judgment against the sheriff, approved as a correct statement of the law as laid down in Hays v. Creary, supra, a charge to the jury "that such mistake could be considered in mitigation of damages, and on the question of malice, but that it would not justify the imprisonment, unless the mistake was caused or contributed to by the plaintiff's words or acts."

It is obvious, we think, that the cases referred to on their facts are so clearly distinguishable from this one that they are of value in determining the question made by the charge refused only because they approve as correct the doctrine announced in the quotation made from Waits' Actions and Defenses. Is this case, as made by said testimony of the witness Scott, within that doctrine? The basis of the doctrine, it will be observed, is the principle applied in cases of equitable estoppel, which has been stated to be: "That where A. has by his acts or representations, or by his silence when he ought to speak out, intentionally or through culpable negligence induced B. to believe certain facts to exist, and B. has rightfully acted on this belief, so that he will be prejudiced if A. is permitted to deny the existence of such facts, A. is conclusively estopped to interpose a denial thereof." 11 A. & E. Enc. Law, p. 421. It may be conceded the jury

might have found from the testimony referred to that appellant's employés were induced by appellee's conduct in placing the pin in his pocket to believe he had it there when they stopped him as he was leaving appellant's store; but can it be said, as was true in the case of the officers in Hays v. Creary and Formwalt v. Hylton, that, had they not been mistaken, they would have had a lawful right to arrest and detain him? Under the laws of this state a citizen can lawfully be arrested and detained only when he has, within the presence or view of the officer or private individual making the arrest, committed a crime classed as a felony or as an "offense against the public peace," or when it is necessary to arrest him "in preventing or interrupting an intrusion upon the lawful possession of property." Willson's Ann. Penal Code, arts. 593, 622, and Criminal Code, art. 247. The pin appellant's employés thought appellee had stolen was worth only ten cents, so, had he stolen it, his offense would not have been a felony. Nor would his offense have been classed as one "against the public peace." If, therefore, appellant's employés had a right to detain him, it must have been for the purpose of "preventing or interrupting an intrusion upon the lawful possession of property" belonging to appellant. A qualification of the authority conferred to arrest without a warrant on this ground is that it must be shown that the arrest and detention were necessary to prevent or interrupt such intrusion. The statute, we think, was intended to authorize the owner of property to use force, if necessary, to enable him to retain possession of property lawfully held by him but not to use force to recover possession thereof lost to him because of the unlawful act of another. The law provides another way by which he can recover possession of property which has been stolen from him. Willson's Ann. C. C. P. art. 343 et seq. In this case, according to the testimony of the witness Scott, if his suspicion had proven to be well-founded, appellee had taken the pin, appellant was no longer in possession of it, and the article of the Penal Code referred to did not justify its employés in using force not to prevent or interrupt an intrusion which had already resulted in transferring the possession of the pin from appellant to appellee, but to regain possession thereof.

If, however, we are wrong in the conclusion reached, we nevertheless are right in holding that the special charge should not have been given for another reason. When approached by appellant's employés and charged with having the pin, appellee promptly denied the truth of the charge and offered then and there to show by turning his pockets inside out that he had not taken the pin. If it should be assumed that thus far appellant's employés were acting within their rights under the doctrine referred to, it is plain they exceeded same under that doctrine when they afterwards, according to his

account of what happened, forcibly compelled appellee to go to the second floor in the building and there submit to indignities offered him. This is made clear by the ruling of the court in Landrum v. Wells, 7 Tex. Civ. App. 625, 26 S. W. 1001. There it appeared that the plaintiff, Wells, had been wrongfully arrested and imprisoned by Landrum and another officer, holding a capias, on a charge of murder. In defense against the recovery sought by Wells against them, the officers set up that the arrest was the result of an honest mistake, and that the mistake was caused by Wells' acts. In discussing the charge to the jury given by the trial court, the Court of Civil Appeals said: "The court instructed the jury that the defendants would not be liable if the plaintiff, by his acts or words, induced the officers to believe that he was the person wanted and named in the warrant. This charge would be appropriate in a case where the evidence shows that the plaintiff, although not the party wanted, stated to the officer making the arrest that he was the person named in the warrant, and the officer acting on such statement made the arrest, for in such a case the plaintiff cannot be heard to complain, because his statement has occasioned his arrest (Hilton v. Fonda, 86 N. Y. 352); but, in a case where the plaintiff denies that he is the person wanted and named in the writ, his previous conduct and statements tending to show that he is the offender would not completely justify the officer in assuming that he is the person named in the warrant, but such conduct and statements may be heard, as before said, in mitigation of the damages that plaintiff seeks to recover. The evidence in this case tends to show that the plaintiff in effect informed the officer when he was arrested that he was not the man wanted, and in view of this statement, although the officers in arresting him acted under the honest conviction and belief that he was the person wanted, they, in effecting said arrest, assumed the risk and hazard of his being the wrong man." The charge refused ignored this feature of the case and required the jury, without reference to it, to find in appellant's favor if they believed appellant's employés in good faith believed, notwithstanding his denial of the fact, that appellee had stolen the pin, and after such denial subjected him to the treatment he testified they did subject him to. Whatever may be said of the right of said employés to act as they did prior to the time they were informed by appellee that he had not taken the pin, thereafterwards, we think, they acted at their peril. Not only did the charge refused ignore said feature of the case, but in it the jury were told to find in favor of appellant if they believed its employés in good faith, as reasonably prudent persons, believed from the conduct of appellee that he had stolen the pin and "did what the proof shows they thereafter did to plaintiff." In other words, the jury were told, on the conditions stated, to find for appellant, without reference to the conduct of its employés after they were advised by appellee that he had not taken the pin.

[4] Much of what has been said applies as well to the special charges numbered 2, 3, and 4. But for another reason also it was not error to refuse to give said special charge numbered 2 to the jury. From an inspection of it as set out in the statement it will be seen that it required the jury to find in appellant's favor, other conditions concurring, if they believed that its manager, Scott, saw appellee take the pin from the counter, put it in his pocket, put it back on the counter, again put it in his pocket, "and walk off with it." Not only was there no testimony showing that appellee walked off with the pin, but it was shown conclusively that he did not walk off with it but left it on the counter. As to said special charges numbered 3 and 4, so far as they may have correctly stated the law, we think they were in effect given to the jury in the court's main charge, and in the special charge numbered 10 given at appellant's request.

[5] By its second assignment appellant attacks as erroneous the first paragraph in the court's main charge, which will be found set out in the statement above. The objection to the instruction is that it was not warranted by either the pleading or the evidence in the case. But we think it was. In his petition appellee alleged that appellant's manager (Scott) and another one of its employés in the store unlawfully arrested him near the front door of the store and forced him to go from that point to the second floor of the building, in the rear thereof, where they unlawfully searched his person. Appellee testified that as he was leaving the store, when he had reached a point near the front door, Scott and another one of appellant's employés stopped him, demanding to know where he was going with the pin in his pocket; that he thereupon denied that he had a pin in his pocket, when Scott, with his hand on his (appellee's) shoulder, said, "Let's go back and see;" that Scott then removed his hand from his shoulder and they walked back to the rear of the store room and then up a stairway to another floor of the building, where he was told to turn all his pockets inside out, which he did; that Scott and the other employé walked behind him from the front part of the store to the other floor thereof, and said other employé, as they so walked back, held him by the collar of his coat and pushed him along. The assignment is overruled.

[6] We have disposed of all the assignments except one in which appellant attacks the verdict as excessive. We believe it is, but have doubted whether we should substitute our judgment as to the sum which will compensate appellee for the wrong done him for that of the jury. The conclusion finally reached by us, keeping in mind the circum-

stances of the case as shown by the record, is that we should, and, as we are of the opinion that $500 will be amply sufficient for that purpose, we will reverse the judgment unless a remittitur of $500 of the sum adjudged in appellee's favor is filed with the clerk within 20 days from the date this opinion is filed. If such a remittitur is so filed, then the judgment will be reformed so as to adjudge a recovery of $500 in appellee's favor, and as so reformed will be affirmed.